## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| **KANAR SARRAJ,** | ) | |
| 14476 Bluff Point Court | ) | |
| Gainesville, Virginia 20155 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action No. |
| | ) | |
| **NORTHERN VIRGINIA** | ) | |
| **ELECTRIC COOPERATIVE** | ) | |
| <u>**Serve Registered Agent:**</u> | ) | **JURY DEMAND** |
| Patrick Toulme | ) | |
| 10323 Lomond Drive | ) | |
| Manassas, VA 20109 | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT

**COMES NOW** Plaintiff, Kanar Sarraj ("Ms. Sarraj" or "Plaintiff"), by counsel, and moves this Court for judgment against Defendant Northern Virginia Electric Cooperative ("Defendant or "NOVEC") in the manner and for the reasons set forth below:

### INTRODUCTION

1. Ms. Sarraj brings federal claims for declaratory and monetary relief against her former employer, NOVEC based on the national origin (Middle Eastern), race (Iraqi Kurdish), sex (female), religion (Muslim), and age discrimination, retaliation, and hostile work environment she faced in violation of the Civil Rights Act of 1964 ("Title VII"), as amended, 42U.S.C.§§ 2000e et seq.; the Civil Rights Act of 1866 ("Section 1981"), as amended, 42 U.S.C. § 1981; and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623.

1

2. Specifically, this matter arises because Plaintiff suffered harm as a result of the discrimination and retaliation she faced during the latter part of her employment at NOVEC.

## JURISDICTION AND VENUE

3. This Court has federal question jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

4. This Court has jurisdiction over Ms. Sarraj's claims under Title VII, Section 1981, and the ADEA.

5. Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b)(2) because the events or omission giving rise to these claims occurred in the Eastern District of Virginia.

6. At all times relevant to this complaint, Defendant was Ms. Sarraj's employer under Title VII, Section 1981, and the ADEA.

7. In consideration of the foregoing, personal jurisdiction and venue are proper in this court.

## PARTIES

8. Plaintiff Kanar Sarraj is a Middle Eastern Iraqi Kurdish female who is Muslim and over 40 years old. Ms. Sarraj began working for NOVEC on June 5, 2013 as a Distribution Engineering ("DE") Manager and stopped working there when her employment was unlawfully terminated on February 3, 2020 after she complained about unequal treatment.

9. Defendant, NOVEC, is an electric distribution system that provides electric service to homes and businesses in Northern Virginia. NOVEC is located in Manassas, Virginia.

## **PROCEDURAL REQUIREMENTS**

10. On or about May 5, 2020, Ms. Sarraj filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") regarding the discrimination, retaliation, and hostile work environment she faced at NOVEC. Her charge was filed within 300 days after one or more of the alleged unlawful employment practices in violation of Title VII and the ADEA had occurred.

11. On or about August 18, 2020, the EEOC transferred Ms. Sarraj's charge to the Prince William County Human Rights Commission for processing.

12. On or about October 9, 2021, Ms. Sarraj received a Notice of Right to Sue from the EEOC. This notice gave Ms. Sarraj ninety days from the receipt of the notice to file her Complaint related to her Title VII and ADEA claims, so her complaint is due on January 7, 2022.

13. Ms. Sarraj has exhausted all administrative remedies required to bring the instant complaint.

## **FACTS**

**Exemplary Performance**

14. Ms. Sarraj began working for NOVEC on June 5, 2013, as a Distribution Engineering ("DE") Manager.

15. From 2015 until her departure in February 2020, Ms. Sarraj was the only Muslim Iraqi Kurdish female in Defendant's engineering department.

16. During her almost seven years of working for Defendant, Ms. Sarraj received all positive reviews. Defendant rated her job performance as "exceeds expectations" throughout her employment.

17. During the two and half years that Ms. Sarraj was a DE manager, her performance reviews indicated that she exceeded expectations.

**NOVEC Gives a Young and Inexperienced White Male Favored Status over Ms. Sarraj**

18. Ms. Sarraj excelled at her job and enjoyed her work until the Vice President of Engineering, Bob Bisson, hired Kevin Whyte as a Distribution Manager in September 2015.

19. Mr. Whyte was a white male in his late 20s at that time. He was only five years out of college and had much less work experience than Ms. Sarraj.

20. Ms. Sarraj was 44 years old at the time Mr. Whyte was hired and had 16 years of experience as an engineer compared to him. She also had a professional engineering certification that Mr. Whyte did not have at that time.

**Mr. Whyte Creates Obstacles and Delays Ms. Sarraj's Projects**

21. In 2015, Ms. Sarraj was the System Engineering and Planning ("SEP") Manager and acting Project Manager for a date center project, and part of the project needed to be conducted by the designers in Mr. Whyte's department.

22. Many new datacenters and gas compressor stations were constructed in the territory, and they all required a substantial amount of electrical power, which gave her additional work associated with conducting additional technical analysis, researching, and planning.

23. Ms. Sarraj performed her work successfully as a SEP manager and as the acting Project Manager for the new datacenters and gas compressor stations from 2016-2019.

24. On January 8, 2016, a supervisor who worked under Mr. Whyte, Josh Johnson, informed Ms. Sarraj that Mr. Whyte told him to stop working on Ms. Sarraj's project. Ms. Sarraj who was the Project Manager at that time. Mr. Whyte's pattern of obstructive behavior continued until Ms. Sarraj was terminated in February 2020.

25. As another example, Mr. Whyte would not release Work Orders, so the job could not move to the construction stage. He would direct his staff to hold the job and not to work on it.

26. Mr. Whyte's conduct harmed Ms. Sarraj by delaying her projects. Yet, Ms. Sarraj was not able to discipline him because he was hired as a manager and they both reported to Mr. Bisson, despite his lesser qualifications and tenure with NOVEC.

27. On many occasions, Ms. Sarraj told Mr. Bisson that Mr. Whyte was creating obstacles for her projects causing them to be on hold and delayed, but Mr. Bisson did not respond to her complaints or attempt to fix the problem nor did he direct Mr. Whyte to cooperate with her.

**Mr. Bisson Allows Mr. Whyte to Block Ms. Sarraj's Project Progress and Reassigns her Significant Work to Mr. Whyte**

28. Mr. Bisson refused to intervene at all or to even to discuss Mr. Whyte's obstructing Ms. Sarraj's projects.

29. Instead, Mr. Bisson reassigned her project to Mr. Whyte, without discussing it with Ms. Sarraj or keeping her in the loop.

30. Mr. Bisson took away other projects and responsibilities from Ms. Sarraj and gave them to Mr. Whyte. These projects and responsibilities were significant growth opportunities for Ms. Sarraj.

31. Ms. Sarraj raised her concerns to Mr. Bisson about how his transfers of her job responsibilities and projects were adversely affecting her.

32. As a result of Mr. Bisson and Mr. Whyte assigning work to the engineers Ms. Sarraj supervised, unbeknownst to Ms. Sarraj, she was unable to track the workload of her team, which had a negative impact on her and undermined her position as a manager.

33. Ms. Sarraj attempted to seek clarity from Mr. Bisson as to why he was taking away her key responsibilities and projects. However, whenever Ms. Sarraj raised these concerns to Mr.

Bisson he would not address her concerns and instead would berate her stating, "**You are a petty and sensitive person**."

34. Other employees noticed Mr. Bisson treated Ms. Sarraj and would ask her why her duties were being transferred to Mr. Whyte, which Ms. Sarraj found to be embarrassing.

35. Ms. Sarraj sent Mr. Bisson many emails between 2016 through 2019, expressing how Mr. Whyte was adversely affecting her work.

36. Specifically, in one email, Ms. Sarraj told Mr. Bisson that Mr. Whyte was making engineering decisions and bypassing her and that he had no respect for her position and responsibilities.

37. Mr. Bisson read the email, but he never addressed Ms. Sarraj's concerns with her other than on rare occasion saying that he would speak with Mr. Whyte. He did not ever reply to her emails or substantively discuss the matters with her verbally.

**Mr. Whyte, Aided by Mr. Bisson Create a Retaliatory and Toxic Work Environment for Ms. Sarraj**

38. On at least ten occasions, Ms. Sarraj informed Mr. Bisson that Mr. Whyte was talking behind her back and bullying her during his department meetings.

39. A spouse of one of Mr. Whyte's employees called her to warn her about Mr. Whyte's actions. Ms. Sarraj informed Mr. Bisson of this warning. Mr. Bisson said he would talk to Mr. Whyte and get back to Ms. Sarraj, but he did not.

40. Mr. Whyte continued harassing Ms. Sarraj to the point where eight employees within NOVEC came to Ms. Sarraj and asked her why Mr. Bisson and Mr. Whyte were retaliating against her.

41. These employees took notice that whenever she asked Mr. Bisson a question, he would answer rudely and disrespectfully; and when they were in meetings with other employees, Mr. Bisson responded to only her in an intimidating way.

42. Mr. Whyte exhibited unprofessional behavior towards other female employees as well, including Wendy Hopkins-Hyre and Robin Harper.

43. Both Ms. Hopkins-Hyre and Ms. Harper felt that Mr. Whyte's treatment towards female employees was unprofessional and disrespectful. Yet no one at NOVEC did anything to correct the issues.

**Protected Activity**

44. During a meeting with Human Resource Manager, Allison Kane, the HR Manager, in 2018, Ms. Sarraj complained about the unfairness and the toxic environment she was facing at the Gainesville office.

45. Ms. Kane did not take any action to address Ms. Sarraj's complaints.

46. Later in 2018, Ms. Sarraj had a meeting with the Vice President of Operations, Dan Swingle. She told him how Mr. Bisson favored Mr. Whyte. Mr. Swingle listened and seemed to sympathize with Ms. Sarraj, but took no action to stop the discrimination, retaliation or improve the work environment for Ms. Sarraj.

**NOVEC's Ongoing Disparate Treatment**

Ms. Sarraj was passed over for leading a NOVEC data center project

47. Several times during her employment, Ms. Sarraj expressed interest in leading one of NOVEC's data center projects.

48. Mr. Bisson would never give Ms. Sarraj opportunities to lead data center projects even though she was qualified to do so.

49. Instead, Mr. Bisson would lead the data center projects himself or give them to Mr. Whyte to lead.

50. Mr. Bisson consistently overlooked Ms. Sarraj for leadership opportunities even though she had all the credentials and knowledge to do the job, more than Mr. Whyte, yet Mr. Bisson would favor Mr. Whyte over Ms. Sarraj.

Ms. Sarraj was passed over for the Specification Committee

51. In 2016, Mr. Bisson allowed Mr. Whyte to be on the Specification Committee, which was a committee to specify equipment and construction assemblies and to develop construction specifications that the design and construction crews would follow when they build the electrical infrastructure.

52. For the longest time, the committee was led by an Iranian (Middle Eastern) engineer, but when Mr. Bisson hired Mr. Whyte, Mr. Bisson took the role away from the Middle Eastern engineer and reassigned it to Mr. Whyte, which was in contravention of NOVEC's established practice.

53. On May 5, 2017, Ms. Sarraj emailed Mr. Bisson to express interest in being on the Specification Committee, however, Ms. Sarraj's request to join the committee was rejected.

54. When Ms. Sarraj expressed concern about there not being an engineer from her department on the committee, Mr. Bisson ignored her, despite previously telling Ms. Sarraj that the Specification Committee must always have an engineer from her department.

Ms. Sarraj was excluded from the engineering candidate interviews

55. On or around April 2018, Mr. Bisson and Mr. Whyte were interviewing a candidate for an engineering position within Ms. Sarraj's department.

56. Ms. Sarraj was intentionally kept out of the process by Mr. Bisson, even though the engineer was to be working in her department.

57. Mr. Whyte had far less experience than Ms. Sarraj and worked in another department, however, Mr. Bisson asked Mr. Whyte be a part of the engineer interviews instead of Ms. Sarraj, yet again showing his preference for the younger, non-Muslim, non-Kurdish male Mr. Whyte.

Ms. Sarraj was excluded from the work process meeting

58. On or around April 2019, there was a work processing issue between the engineering department and the operations department.

59. Mr. Bisson called a meeting to discuss solutions and find best working process methodology to solve the issue.

60. Mr. Bisson did not invite Ms. Sarraj to the meeting even though the issue involved her department, the engineering department. Instead, Mr. Bisson invited Mr. Whyte to the meeting.

61. Another manager was surprised that Ms. Sarraj was not at the meeting and later asked her why she had not been included.

**Direct Evidence of Mr. Bisson's Discriminatory Behavior Towards Ms. Sarraj regarding her Religion, Race, and National Origin**

62. Mr. Bisson would often ask Ms. Sarraj inappropriate questions about Muslims.

63. Mr. Bisson would ask Ms. Sarraj, **"Why are Muslims so close minded?"** and **"Why can't Muslims resolve conflicts with dialogue?"**

64. During the ISIS war, Mr. Bisson would ask Ms. Sarraj questions focused on why Muslims were doing bad things around the world. For example, Mr. Bisson asked Ms. Sarraj, **"Why are Muslims so brutal and can't solve their problems like western people?"**

65. Mr. Bisson frequently made jokes about Ms. Sarraj's accent and would make comments about her engineering degree being from a "foreign country."

66. Additionally, part of Ms. Sarraj's job as a manager was to hire engineers. Ms. Sarraj noticed that any time she presented a resume to Mr. Bisson that was from a Middle Eastern candidate, he would make jokes about their names and pronunciation and make comments about their intelligence.

**Direct Evidence of Mr. Bisson's Discriminatory Behavior Towards Ms. Sarraj regarding her Gender**

67. Mr. Bisson publicly stated at work one day that **"If it weren't for men ruling, women wouldn't know what to do."**

68. Mr. Bisson's outward discriminatory behavior incentivized other managers to act similarly and disrespect women in Ms. Sarraj's office.

69. As a result, male managers would tell inappropriate jokes that made Ms. Sarraj and other women uncomfortable at work.

70. One day a risk manager approached Ms. Sarraj and asked her if Mr. Bisson had daughters because of how disrespectful he was toward women.

71. NOVEC eventually took away Mr. Bisson's responsibilities of  managing data center projects, distribution engineering, and system engineering, because of his discriminatory behavior towards Ms. Sarraj and other women in the office. However, despite Mr. Bisson's discriminatory conduct, Mr. Bisson maintained his title of Vice President of the Engineering Department.

**Ms. Sarraj Engages in Additional Protected Activity**

72. In 2018, Ms. Sarraj complained to the Human Resource Manager, Ms. Kane, to try to get the discriminatory and hostile work environment to stop.

73. Ms. Sarraj complained about how Mr. Bisson unfairly favored preferred Mr. Whyte and took opportunities from her and assigned them to him.

74. Ms. Sarraj expressed and discussed the toxic environment and the bullying with Ms. Kane and told her that she didn't think she could continue in the Gainesville office.

75. Ms. Kane said that she would let Ms. Sarraj know when there was a manager position opening at a different office. That was the extent of Ms. Kane's handling of Ms. Sarraj's complaints.

76. At the end of 2018, Ms. Sarraj also complained to the Vice President of Operations, Mr. Swingle, about the mistreatment and toxic work environment she experience in the Gainesville office.

77. Ms. Sarraj told him that Mr. Bisson favored Mr. Whyte.

78. Neither Ms. Kane nor Mr. Swingle took any actions to stop the discrimination, retaliation, or to improve the work environment for Ms. Sarraj.

**NOVEC's Retaliation Against Ms. Sarraj After she Complains of Discrimination**

Ms. Sarraj was passed over for the role of Director of the Engineering Department

79. In July 2019, after Ms. Sarraj came back from summer vacation, Mr. Bisson called her into his office and informed her that he had eliminated her position while she was on vacation.

80. Mr. Bisson said that he combined Mr. Whyte's distribution department with her engineering department. He said he chose Mr. Whyte to be the new "Director" of the department.

81. Ms. Sarraj was surprised to hear this because she possessed more managerial experience and technical credential qualifications than Mr. Whyte.

82. Mr. Bisson handpicked Mr. Whyte for the role without advertising the position, so Mr. Bisson never gave her the opportunity to apply for the Director position.

Ultimatum:  Leave or be Demoted

83. Mr. Bisson told Ms. Sarraj that she could either <u>leave the company</u> or take a Project Manager ("PM") position.

84. The PM position was a demotion because Ms. Sarraj's project manager salary grade would have been lower than a manager salary grade. As a Department Manager, Ms. Sarraj's pay grade was 23 at the high end of the salary which gave her access to a higher bonus percentage allocation and she was eligible for multiple bonus categories. As a Project Manager, her pay grade was 22.

85. The PM position was not a technical or engineering position at all, so Ms. Sarraj would not be able to continue practicing her engineering skills and applying her technical knowledge and background.

86. Ms. Sarraj realizes now that Mr. Bisson was trying to get her to voluntarily quit.

87. She had no choice but to accept the demotion in pay and grade as she had three children, with one in college and could not afford to be without a job.

88. Yet again, Ms. Sarraj found herself with lesser pay and job opportunities after Mr. Bisson eliminated her position and promoted Mr. Whyte to "Director" despite Ms. Sarraj being more qualified for the role.

89. As the department Director, Mr. Whyte had a higher pay grade (grade 24) than Ms. Sarraj had a as project manager (grade 22) despite her being more qualified for the role given her greater work experience.

**Ms. Sarraj's Second Request for a Transfer**

90. Ms. Sarraj scheduled a meeting with the CEO, Stan Feuerberg, to make a personal appeal for him to transfer the PM position to a different division because she could not continue working under Mr. Bisson.

91. During the meeting with Mr. Feuerberg, Ms. Sarraj explained that she could not work with Mr. Bisson any longer and that she believed her new role was a demotion and asked to transfer out of the Gainesville office.

92. In response, Mr. Feuerberg, acknowledged Ms. Sarraj's excellent job performance and told her that she was the best candidate to fill the PM position because of her strong management, technical knowledge, and background.

93. Ms. Sarraj reiterated her concerns about Mr. Bisson and other employees under his influence retaliating against me and interfering with her work.

94. Mr. Feuerberg agreed to move Ms. Sarraj's position to another division, "Administration, Substation, and Telecommunications," where she would work under the Vice President of the division, Dave Schleicher rather than Mr. Bisson.

95. Ms. Sarraj began working for Mr. Schleicher on or around July 31, 2019.

**NOVEC's Retaliation Against Ms. Sarraj Continues Unabated**

96. When Ms. Sarraj started working for Mr. Schliecher in 2019, she expressed her fear with Mr. Schliecher about Mr. Bisson retaliating against her and impeding her projects again.

97. Mr. Schleicher told Ms. Sarraj he would intervene if Mr. Bisson or other employees became an obstacle to her projects.

98. When Ms. Sarraj started working for Mr. Schleicher, his direction to her was to establish the foundation of the project manager position in the first couple of months of her employment.

99. He summarized his expectation in an email sent in August 2019. He asked her for the PM position outline document.

100. In response, Ms. Sarraj had developed multiple versions of Project Management position outline and sent them to Mr. Schleicher for input and approval, but she did not get feedback from him about the project manager job outline she'd developed.

101. She didn't have clear direction from Mr. Schleicher on how he wanted the outline to look and what it should include. Ms. Sarraj sent several outlines to Mr. Schleicher via email during the August 2019 to January 2020 timeframe.

102. Mr. Schleicher also did not provide Ms. Sarraj with her 2019 goals, which concerned her given that goal setting is a big part of the NOVEC's performance review process.

103. Within the first three months of Ms. Sarraj working as PM, Mr. Schleicher continued to change her responsibilities and expectations for the position on a regular basis.

104. Further, Mr. Schleicher limited Ms. Sarraj's role so she did not have authority over the entire date center project, which was not what Ms. Sarraj was told when she accepted the PM position in July 2019.

105. Yet again, Mr. Bisson, Mr. Whyte, and the engineers and designers in Mr. Bisson's group, began to refuse to share important project information with Ms. Sarraj. Ms. Sarraj made multiple attempts to request information from Mr. Bisson and Mr. Whyte for her projects and status of tasks.

106. Mr. Bisson and Mr. Whyte would not cooperate with her and would not provide her with information she needed to complete her projects, and they would not complete the necessary tasks for the projects she was managing.

107. Mr. Bisson continued to frustrate Ms. Sarraj's work by trying to make her appear incompetent before customers. Mr. Bisson would have discussions with customers and promise them a different work scope than what was stated in the contract. Mr. Bisson would not include Ms. Sarraj in these discussions or in his decision-making despite the fact that she was the PM of the data center projects.

108. Ms. Sarraj was assigned a new substation project and some of the tasks needed to be completed by Mr. Bisson and Mr. Whyte.

109. From September 2019 to January 2020, Ms. Sarraj reached out to both of Mr. Bisson and Mr. Whyte multiple times via email and phone, requesting status and timelines for completion and to provide them with the deadlines that those tasks needed to be completed by to meet the customer's deadline.

110. Neither Mr. Bisson nor Mr. Whyte responded to her.

111. Mr. Whyte never picked up the phone when Ms. Sarraj called despite him knowing how important it was to speak with Ms. Sarraj about certain projects.

112. Mr. Whyte's non-responsiveness continued to obstruct Ms. Sarraj's work and was frustrating and affecting her performance.

113. Ms. Sarraj complained to Mr. Schleicher about Mr. Bisson and Mr. Whyte, namely of their lack of cooperation with Ms. Sarraj, their refusal to provide her with information she needed to complete her projects, and that they would not complete the necessary tasks for the projects she was managing.

114. Mr. Schleicher had to speak with Mr. Bisson and Mr. Whyte in order to get them to cooperate with Ms. Sarraj.

**Ms. Sarraj's Unlawful Termination**

115. On February 3, 2020, Mr. Schleicher presented Ms. Sarraj with a separation agreement and told her that her performance was an issue.

116. Prior to February 3, 2020, NOVEC never disciplined Ms. Sarraj or put her on a performance improvement plan, pursuant to the progressive discipline outlined in NOVEC's Employee Guidebook.

117. Ms. Sarraj asked Mr. Schleicher for examples of the issues NOVEC had with her performance, however, Mr. Schleicher did not provide any.

118. For the past six years, Ms. Sarraj's performance reviews stated that she "Meets Performance Expectations."

119. Eventually, Mr. Schleicher disclosed to Ms. Sarraj that she was fired because of the relationship between her and Mr. Bisson's group was not improving.

120. At a later time, NOVEC changed its reasoning stating that it terminated Ms. Sarraj because 1) she used a scheduling application, Monday.com, instead of Excel or MS projects, 2) she did not create and maintain necessary internal relationships to perform in her position, 3) she did not develop process and procedures, and 4) she did not "mend the relationship" between Mr. Whyte.

121. NOVEC's stated reasons for terminating Ms. Sarraj are pretextual.

122. NOVEC's IT department replaced Ms. Sarraj's MS project software with Monday.com, which was a project management tool. The IT department directed Ms. Sarraj and other project managers like Renee Barr, to use Monday.com, which Mr. Schleicher agreed to her

using. Mr. Schleicher never expressed his preference of using one tool over another and Ms. Sarraj provided him with her project progress and task completion in an excel sheet as he requested.

123. Ms. Sarraj maintained professional relationships with all staff, including those in other departments that she needed to work closely with. However, Mr. Whyte did not want a professional relationship with Ms. Sarraj, which he made clear through his refusal to work and corporate with her, and his harassment towards her. Mr. Whyte would never pick up the phone when Ms. Sarraj called him, and he would not respond to her.

124. Ms. Sarraj sought management's intervention to address her civil rights issues multiple times during the course of her employment, but NOVEC took no corrective action against Mr. Bisson and Mr. Whyte and instead terminated Ms. Sarraj for engaging in protected activity.

125. After terminating Ms. Sarraj from her employment at NOVEC in February 2020, they brought back Ms. Sarraj's SEP Manager position that they had "eliminated" to demote her. In January 2021, they hired a white under-40-year-old female non-Muslim with less experience than Ms. Sarraj to fill the SEP Manager role.

**Damages**

126. Ms. Sarraj has faced disparate treatment in advancement opportunities, promotion, pay, and discipline due to her protected activity. The examples above show the egregious coordinated attempts by Mr. Bisson and Mr. Whyte to continue to target and retaliate against Ms. Sarraj due to her national origin, race, gender, religion, and age, and due to her complaints of discrimination and opposition to NOVEC's unlawful behavior.

127. Mr. Bisson's and Mr. Whyte's ongoing harassment of Ms. Sarraj and their systematic and unlawful targeting of Ms. Sarraj changed her.

128. The discrimination, retaliation and hostile work environment have significantly affected Ms. Sarraj mentally, emotionally, physically and financially. She endured an enormous amount of stress and anxiety that impacted her family relationships. She was always mad and angry.  She began to suffer from anxiety and depression.

129. The stress and anxiety negatively impacted Ms. Sarraj's physical health, as well. Many times, she had severe migraine headaches that caused her to be in bed for two to three days. Her doctor instructed her that she needed to stay away from stressful situations, otherwise the impact would be even more severe. Ms. Sarraj also gained 25 pounds due to the stress and anxiety.

130. Ms. Sarraj suffered financial hardship due to NOVEC's unlawful behavior towards her. She lost her job, benefits, employer contributions toward her retirement pension plan, and her ability to earn a higher income with NOVEC.

## COUNT I: SEX DISCRIMINATION
### (Title VII)

131. Plaintiff re-alleges, adopts and incorporates by reference of all averments in the foregoing paragraphs.

132. Title VII, prohibit employers from discriminating against their employees because of their sex.

133. Defendant was at all times relevant to this matter, the employer of Ms. Sarraj for all purposes under Title VII.

134. Defendant engaged in unlawful discrimination against Ms. Sarraj because of her sex, as described above.

135. Defendant subjected Ms. Sarraj to disparate treatment in advancement opportunities, promotion, pay, and discipline.

136. Defendant's discrimination against Ms. Sarraj was an intentional or reckless disregard of her rights under Title VII.

137. Defendant engaged in the discriminatory actions described above with malice, or with a reckless indifference to Ms. Sarraj's legal rights, subjecting her to adverse terms and conditions of employment because of her sex. Title VII provides that Ms. Sarraj is therefore entitled to punitive damages for Defendant's actions alleged herein.

138. Ms. Sarraj has been damaged as a result of Defendant's willful, intentional and unlawful conduct. As a direct and proximate result of Defendant's conduct, Ms. Sarraj has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to her reputation and good will, backpay, litigation expenses including attorney's fees, and consequential damages, and other injuries.

### COUNT II: NATIONAL ORIGIN DISCRIMINATION
#### (Title VII)

139. Plaintiff re-alleges, adopts and incorporates by reference of all averments in the foregoing paragraphs.

140. Title VII, prohibit employers from discriminating against their employees because of their national origin.

141. Defendant was at all times relevant to this matter, the employer of Ms. Sarraj for all purposes under Title VII.

142. Defendant engaged in unlawful discrimination against Ms. Sarraj because of her national origin, as described above.

143. Defendant subjected Ms. Sarraj to disparate treatment in advancement opportunities, promotion, pay, and discipline.

144. Defendant's discrimination against Ms. Sarraj was an intentional or reckless disregard of her rights under Title VII.

145. Defendant engaged in the discriminatory actions described above with malice, or with a reckless indifference to Ms. Sarraj's legal rights, subjecting her to adverse terms and conditions of employment because of her national origin. Title VII provides that Ms. Sarraj is therefore entitled to punitive damages for Defendant's actions alleged herein.

146. Ms. Sarraj has been damaged as a result of Defendant's willful, intentional and unlawful conduct. As a direct and proximate result of Defendant's conduct, Ms. Sarraj has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to her reputation and good will, backpay, litigation expenses including attorney's fees, and consequential damages, and other injuries.

## COUNT III: RELIGIOUS DISCRIMINATION
### (Title VII)

147. Plaintiff re-alleges, adopts and incorporates by reference of all averments in the foregoing paragraphs.

148. Title VII, prohibit employers from discriminating against their employees because of their religion.

149. Defendant was at all times relevant to this matter, the employer of Ms. Sarraj for all purposes under Title VII.

150. Defendant engaged in unlawful discrimination against Ms. Sarraj because of her religion, as described above.

151. Defendant subjected Ms. Sarraj to disparate treatment in advancement opportunities, promotion, pay, and discipline.

152. Defendant's discrimination against Ms. Sarraj was an intentional or reckless disregard of her rights under Title VII.

153. Defendant engaged in the discriminatory actions described above with malice, or with a reckless indifference to Ms. Sarraj's legal rights, subjecting her to adverse terms and conditions of employment because of her religion. Title VII provides that Ms. Sarraj is therefore entitled to punitive damages for Defendant's actions alleged herein.

154. Ms. Sarraj has been damaged as a result of Defendant's willful, intentional and unlawful conduct. As a direct and proximate result of Defendant's conduct, Ms. Sarraj has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to her reputation and good will, backpay, litigation expenses including attorney's fees, and consequential damages, and other injuries.

## COUNT IV: RACE DISCRIMINATION
### (Title VII, Section 1981)

155. Plaintiff re-alleges, adopts and incorporates by reference of all averments in the foregoing paragraphs.

156. Title VII, and Section 1981, prohibit employers from discriminating against their employees because of their race.

157. At all times relevant to this matter, Defendant was Ms. Sarraj's employer for all purposes under Title VII, and Section 1981.

158. Defendant engaged in unlawful discrimination against Ms. Sarraj because of her race, as described above.

159. Defendant subjected Ms. Sarraj to disparate treatment in advancement opportunities, promotion, pay, and discipline.

160. Defendant's discrimination against Ms. Sarraj was an intentional or reckless disregard of her rights under Title VII and Section 1981.

161. Defendant engaged in the discriminatory actions described above with malice, or with a reckless indifference to Ms. Sarraj's legal rights, subjecting her to adverse terms and conditions of employment because of his race in violation of Title VII and Section 1981. As such, Ms. Sarraj is therefore entitled to punitive damages.

162. Ms. Sarraj has been damaged as a result of Defendant's willful, intentional and unlawful conduct. As a direct and proximate result of Defendant's conduct, Ms. Sarraj has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to her reputation and good will, backpay, litigation expenses including attorney's fees, and consequential damages, and other injuries.

## COUNT V: AGE DISCRIMINATION
### (ADEA)

163. Plaintiff re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

164. The ADEA prohibits employers from discriminating against their employees because of their age.

165. Ms. Sarraj is in protected status groups because she is over the age of 40.

166. Ms. Sarraj was fully qualified to perform in her job positions at NOVEC and was meeting NOVEC's expectations during her employment, which is evidenced by her performance reviews.

167. Defendant engaged in unlawful discrimination against Ms. Sarraj because of her age, as described above

168. NOVEC treated Ms. Sarraj in a disparate manner than other employees under the age of 40, giving favor, opportunities and advantages to employees substantially younger than her, i.e., Mr. Whyte who was in his 20s, while depriving her of similarly situated favorable opportunities, advantages, and treatment.

169. NOVEC's discrimination against Ms. Sarraj was an intentional or reckless disregard of her rights under the ADEA.

170. NOVEC engaged in the discriminatory actions described above with malice, or with a reckless indifference to Ms. Sarraj's legal rights, subjected her to adverse terms and conditions of employment because of her age in violation of the ADEA.

171. Ms. Sarraj has been damaged as a result of NOVEC's willful, intentional and unlawful conduct. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, continues to suffer, and will in the future sufferance humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damages to her reputation and good will, litigation expenses including attorney's fees, and consequential damages, and other injuries.

## COUNT VI: HOSTILE WORK ENVIRONMENT
### (Title VII, Section 1981, ADEA)

172. Ms. Sarraj re-alleges, adopts, and incorporates by reference all averments in the foregoing paragraphs.

173. Title VII, the ADEA, and Section 1981, prevent employers from subjecting employees to a hostile work environment due to their membership in a protected status group.

174. Ms. Sarraj is a person protected by said provisions of Title VII, the ADEA, and Section 1981.

175. NOVEC created a hostile work environment by allowing Mr. Bisson and Mr. Whyte to harass Ms. Sarraj due to her protected status group and protected activities, as described above.

176. Mr. Whyte's and Mr. Bisson's unwelcome conduct was based on Ms. Sarraj's protected characteristic and was sufficient severe or pervasive to alter the conditions of her employment, and create an abusive and fearful work environment atmosphere that was imputable to NOVAC.

177. Ms. Sarraj has been damaged as a result of NOVAC's willful, intentional and unlawful conduct. As a direct and proximate result of NOVAC's conduct, Ms. Sarraj has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to her reputation and good will, backpay loss of employee benefits, litigation expense including attorney's fees, and other damages.

**COUNT VII: RETALIATION**
(Title VII, Section 1981 and ADEA)

178. Plaintiff re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

179. Under Title VII, the ADEA, and Section 1981, it is unlawful employment practice for an employer to retaliate against any individual by taking an adverse action because of the individual's protected activity.

180. Ms. Sarraj, because of her race, was denied terms and conditions of employment in violation of Title VII, the ADEA, and Section 1981.

181. Ms. Sarraj is a person protected by said provisions of Title VII, the ADEA, and Section 1981.

182. NOVEC's discrimination against Ms. Sarraj was an intentional or reckless disregard of Plaintiff's rights under Title VII, the ADEA, and Section 1981.

183. Ms. Sarraj engaged in protected activity when she made complaints to NOVAC's management, Human Resources, and the EEOC about the discrimination, harassment, hostile work environment, and retaliation she was suffering.

184. NOVAC was aware of Ms. Sarraj's protected activity.

185. NOVAC engaged in retaliation in violation of Title VII, the ADEA, and Section 1981, in connection with its treatment of Ms. Sarraj and the terms and conditions of Ms. Sarraj employment, as described above.

186. NOVEC retaliated against Ms. Sarraj by passing her over for promotions and growth opportunities, i.e., NOVEC rejected her request to be on the Specification Committee, NOVEC did not allow Ms. Sarraj to lead a NOVEC data center project, and NOVEC did not give her the opportunity to apply for the position of Director of the Engineering department.

187. Ms. Sarraj faced retaliation when Mr. Bisson and Mr. Whyte excluded her from candidate interviews involving her department and from work process meetings involving her department.

188. Ms. Sarraj faced retaliation when Mr. Bisson and Mr. Whyte refused to cooperate with her and provide important project information to her when she requested it, intentionally ignoring her requests, emails, and calls. Mr. Whyte further retaliated against Ms. Sarraj

by talking behind her back and bulling her during department meetings to the extent that other employees noticed Mr. Whyte's retaliatory conduct.

189. NOVEC retaliated against Ms. Sarraj by eliminating her position of DE Manager and demoting her to Project Manager, with a lesser pay grade.

190. NOVEC retaliated against Ms. Sarraj by terminating her for illegitimate and pretextual reasons.

191. Ms. Sarraj was fully qualified to perform in her job positions at NOVEC.

192. In doing the acts and engaging in the conduct herein alleged, NOVEC intended to and did vex, harass, annoy, and cause Ms. Sarraj to suffer and continue to suffer emotional distress.

193. Defendant's acts alleged herein are malicious, oppressive, and in conscious disregard of Ms. Sarraj's rights. As such, punitive damages are warranted against Defendants.

194. Ms. Sarraj has been damaged as a result of Defendant's willful, intentional and unlawful conduct. As a direct and proximate result of Defendant's conduct, Ms. Sarraj has suffered, continues to suffer, and will in the future suffer humiliation, distress, embarrassment, inconvenience, mental anguish, pain, suffering, injury and damages, including damage to her reputation and good will, litigation expenses including attorney's fees, and consequential damages, and other injuries.

**PRAYER FOR RELIEF**

**NOW, WHEREFORE,** Plaintiff prays this Court to:

    a.   Enter judgment in Plaintiff's favor against Defendant;

    b.   Declare that the conduct of Defendant was a willful violation of the Plaintiff's rights as secured by Title VII, Section 1981, and the ADEA.

26

c.   Award Ms. Sarraj punitive damages in an amount to be shown at trial;

d.   Award Ms. Sarraj full back pay including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses, cash awards, loss of retirement savings and benefits, and other remuneration and privileges of employment retroactive to the date of any unlawful action found to have occurred in this case;

e.   Award Ms. Sarraj front pay and pecuniary and out-of-pocket expenses;

f.   Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses incurred by Ms. Sarraj as a result of Defendant's actions and inactions, as well as pre- and post-judgment interest;

g.   Grant Ms. Sarraj such other and further relief as justice may require and are within the equitable powers for this honorable Court.

**JURY DEMAND**

Plaintiff seeks trial by jury on all matters and issues that can be so tried.


Dated: January 6, 2022                              Respectfully Submitted,

                                                   **Kanar Sarraj**
                                                   By Counsel:


                                                   /s/ Monique A. Miles_____
                                                   Monique A. Miles, Esq.
                                                   Virginia Bar No. 78828
                                                   Old Towne Associates, P.C.
                                                   216 South Patrick Street
                                                   Alexandria, VA 22314-3528
                                                   Phone: 703-519-6810
                                                   mmiles@oldtowneassociates.com

                                                   Danielle G. Pimentel, Esq. (VSB #: 95715)
                                                   Old Towne Associates, P.C.

216 South Patrick Street
Alexandria, Virginia 22314
Phone: 703-519-6810
dpimentel@oldtowneassociates.com

*Counsel for Plaintiff*